UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA     :          88-CR-642 (LAP)
                             :
                             :
              v.             :          ORDER
                             :
RAFAEL ROMERO,               :
                             :
              Defendant.     :
------------------------------x

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is Defendant Rafael Romero's pro se motion

for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A),

(dkt. no. 239), supplemented by counsel's memorandum of law and

declaration, (dkt. nos. 292, 293).  The Government opposed (dkt.

no. 301), and Defendant replied, (dkt. no. 303).  For the reasons

set out below, the motion is DENIED.

I.   **Background**

    a. **Defendant's Offense Conduct**

    On September 6, 1988, Defendant brokered a cocaine

transaction between himself, his two co-defendants, Albert

Rodriguez and Rafael Santos, and two confidential informants with

the Drug Enforcement Administration ("DEA").  (See Sent. Tr. at

82.)  The transaction was set to take place at an uptown Manhattan

apartment.  (See id.)  As Defendant and one of the confidential

informants were exiting the apartment to obtain what Defendant

thought would be "buy money" to pay for the cocaine, DEA agents

executed a raid on the apartment. (Id.) DEA agents first placed Defendant under arrest outside of the apartment. (Id.) Defendant briefly broke free from the agents and ran outside of the apartment, but other agents who were positioned outside of the apartment were able to arrest Defendant. (PSR ¶ 25.) Co-defendant Rodriguez fled into the apartment and attempted to dispose of a kilogram of cocaine, but he was wrestled to the ground by another DEA agent. (Sent. Tr. at 82.) During a sweep of the apartment, DEA Special Agent Bruce Travers opened a closet door behind which co-defendant Santos was waiting with a loaded firearm. (Id.) Santos shot Special Agent Travers in the face, nearly killing him. (Id.) Special Agent Travers sustained serious injuries to his face caused by "a gun shot wound that entered below his chin, travelled up through the roof of his mo[u]th and out his cheek, shattering his cheek bone." (PSR ¶¶ 17-20.) After Special Agent Travers fell to the ground, Santos remained in the closet and continued to fire over Travers's bloody body at the other agents and informants in the apartment, striking one of the confidential informants in the process. (Id. ¶¶ 16-17.) Santos continued to shoot until he fired every round in his revolver, after which he was also arrested. (Id. ¶ 19.)

Following the shooting, law enforcement officials conducted a search of the apartment and found "a cache of approximately 100 .22 caliber live rounds on a counter and 15 .357 Magnum hollow

point rounds on top of the refrigerator in the kitchen." (Sent. Tr. at 18.)  Santos fired a .357 Magnum revolver at Special Agent Travers, and that weapon was in Santos' possession at the time of his arrest.  (Id.)

### b. Defendant's Criminal History

At the time of sentencing, Defendant had zero criminal history points and was therefore in Criminal History Category I.  (PSR ¶ 36.)  Defendant is a citizen of the Dominican Republic.  Prior to his conviction for the underlying offense, Defendant was an alien unlawfully present in the United States.  Accordingly, at the conclusion of Defendant's custodial sentence he will be subject to deportation proceedings.  (Id. ¶ 37; Shellow Decl. at Ex. T.)

### c. Procedural History

Defendant was initially charged in a five-count indictment on September 20, 1988.  A superseding indictment was filed on October 6, 1988.  On February 16, 1989, the Government filed a second superseding indictment (the "S2 Indictment"), on which Defendant and his co-defendants Rodriguez and Santos were tried and convicted.

The S2 Indictment brought the following six charges against all defendants: (1) conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One); (2) possession of more than 500 grams of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1) and

3

(b)(1)(B) (Count Two); (3) use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three); (4) assault of a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111 (Count Four); (5) conspiracy to murder a federal officer, in violation of 18 U.S.C. § 1117 (Count Five); and (6) attempted murder of a federal officer, in violation of 18 U.S.C. §§ 1111 and 1114 (Count Six). Santos was also charged in Count Seven with receiving and possessing a firearm with a defaced or altered serial number, in violation of 26 U.S.C. §§ 5861(h) and 5871 (Count Seven).

### i. Trial and Sentencing

Defendant proceeded to trial, and, on March 15, 1989, the jury returned guilty verdicts against Defendant on Counts One through Six, as described above. On May 25, 1989, U.S. District Judge Robert J. Ward held a sentencing hearing at which the 1988 Guidelines Manual, which was effective October 15, 1988, applied. Judge Ward sentenced Defendant to concurrent sentences of life imprisonment on the conspiracy charges in Counts One and Five, twenty years for the attempted murder in Count Six, ten years each for the possession of cocaine with intent to distribute in Count Two and the assault of a federal officer in Court Four, and a consecutive sentence of five years for use of a firearm during and in relation to a drug trafficking crime in Count Three. (Sent. Tr. at 84-87).

In imposing this sentence, the Court emphasized the seriousness of the offense and that, although Defendant was not the person who fired the gun that wounded Special Agent Travers, the shooter Santos "had done what he had been told to do" by his co-defendants, including Defendant, which was "to fire on anyone who might be interfering with what was occurring in the apartment." (Id. at 83.) In addition, the Court noted that "firearms are tools of the narcotics trafficking trade" and that "testimony at trial included testimony that defendant Romero himself conducted a pat-down or search for weapons on the person of the two confidential informants when they entered apartment 3D at 510 West 150th Street." (Id. at 17.)

### ii. Prior Applications for Post-Conviction Relief

On February 20, 1990, Romero's conviction was affirmed on appeal. See United States v. Romero, 897 F.2d 47, 51 (2d Cir. 1990) (finding that a "reasonable jury could infer that [co-defendant] Santos's taking up a strategic position in the closet while Romero and [co-defendant] Rodriguez conducted their narcotics business did not occur by chance, but rather was the result of a plan agreed to by all the defendants to kill anyone posing a threat to them or the business").

On February 11, 1997, Judge Ward denied a motion filed by Defendant pursuant to 18 U.S.C. § 3582(c)(2) seeking to have his sentence reduced on the basis of Amendment 505 of the Sentencing

5

Guidelines, which revised the Drug Quantity Table in U.S.S.G. § 2D1.1.  See Romero v. United States, No. 88 Cr. 642 (RJW), 1997 U.S. Dist. LEXIS 1330, at *3 (S.D.N.Y. Feb. 11, 1997).

On April 24, 2002, Defendant filed a motion pursuant to 18 U.S.C. § 3582(c)(2) on the grounds that Amendments 123 and 311 to the Sentencing Guidelines, both of which became effective after his May 25, 1989 sentencing, should be retroactively applied in his case and that his sentence should be reduced accordingly.  See Romero v. United States, No. 88 Cr. 642 (RJW), 2002 U.S. Dist. LEXIS 7503, at *1 (S.D.N.Y. Apr. 29, 2002).  Judge Ward also denied this motion because neither Amendment 123 nor Amendment 311 was on the list provided by the Sentencing Commission policy statement governing when a sentence is authorized to apply retroactively under an amended guideline range pursuant to 18 U.S.C. § 3582(c)(2).  See id. at *2.

On July 28, 2015, this Court denied Defendant's motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(2) on the basis that the "defendant is ineligible for a sentence reduction by virtue of § 2D1.1(a)(2)."  (Dkt. no. 158.)  Defendant's motion at that time also appeared to be based on Amendment 782.  (Dkt. no. 150.)

On September 21, 2017, this Court denied Defendant's petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C.

§ 2255.  <u>See</u> <u>Romero v. United States</u>, No. 15 Civ. 6512 (LAP), 2017 WL 4516819, at *12 (S.D.N.Y. Sept. 21, 2017).

### iii.  Current Custody Status

As of this order, Romero is currently housed at FCI Edgefield.

### d. Defendant's Motion for a Sentence Reduction

On March 19, 2020, Defendant filed a pro se motion seeking a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  On April 17, 2020, the motion was docketed.  (<u>See</u> dkt. no. 239.)  On April 17, 2020, the Court appointed CJA counsel to represent Defendant and ordered that any supplement to the pro se motion be filed within 30 days of the order.  (Dkt. no. 293 ¶ 3.)  After multiple extensions of the filing deadline, on February 14, 2024, Defendant, through counsel, filed a supplemental memorandum of law and declaration in support of his motion seeking a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Dkt. nos. 292.)

Defendant makes several arguments in support of his instant motion, specifically that his sentence should be reduced because: (1) the Sentencing Guidelines are now discretionary, whereas they were mandatory when he was initially sentenced, (<u>id.</u> at 3); (2) his sentence is considerably longer than sentences of other defendants who are convicted of the same type of conduct today, (<u>id.</u> at 18); (3) he has been significantly rehabilitated, (<u>id.</u> at 21-31); (4) he suffers from prediabetes, headaches, "depression and anxiety," and long-term effects of having tested positive for

COVID, (id. at 33-34); and (5) he wants an order of deportation to be sent home to the Dominican Republic where he can be with his ailing wife, (id. at 36-37).

On August 14, 2023, Defendant submitted a compassionate release request to the warden of FCI Edgefield.  On December 13, 2023, the Warden denied the request.

## II.  **Applicable Law**

Under 18 U.S.C. § 3582, as amended by the First Step Act, the court "may not modify a term of imprisonment once it has been imposed except that":

> [T]he court, upon motion of the Director of the Bureau of Prisons [(the "BOP")], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

"Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf."  United States v. Corbett, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023)

(citing United States v. Phillibert, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2020). But in 2018, Congress enacted the First Step Act and "authorized courts to reduce a term of imprisonment upon motion by a defendant." United States v. Amato, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

The Sentencing Commission is responsible for "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Accordingly, even before the First Step Act was enacted, the Sentencing Commission promulgated a policy statement—Section 1B1.13 of the Guidelines—concerning sentence reductions under Section 3582, which explained, among other things, what constitutes an extraordinary and compelling reason for a sentence reduction.

In September 2020, the Court of Appeals held that this policy statement "applied only to a 'motion of the Director of the Bureau of Prisons,' see U.S.S.G. § 1B1.13 (historical note), and not 'to compassionate release motions brought by defendants[.]'" Corbett, 2023 WL 8073638, at *3 (quoting United States v. Brooker, 976 F.3d 228, 236 (2d Cir. 2020)). As a result, the Court of Appeals explained that the policy statement did not "constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Brooker, 976 F.3d at 236. Even though Section 1B1.13 did not govern compassionate release motions

9

filed by a defendant, district courts were nevertheless able to "look[] to § 1B1.13 for guidance in the exercise of [their] discretion" when considering such a motion.  United States v. Rodriguez, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *3 (S.D.N.Y. Dec. 23, 2020).

However, "[e]ffective November 1, 2023, . . . the Sentencing Commission amended the Guidelines to also cover defendant-initiated petitions."  Corbett, 2023 WL 8073638, at *3 (citing Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023)).  "The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated."  Id.  Section 1B1.13 of the Guidelines, as amended, explains what circumstances, "singly or in combination," constitute extraordinary and compelling reasons for release.  Id.  These include, at a high level, certain medical circumstances of the defendant, the age of the defendant, certain family circumstances, whether the defendant was the victim of abuse while in custody, other circumstances of similar gravity, and changes in law that make the defendant's sentence unusually long. See U.S.S.G. § 1B1.13(b); United States v. Mendez-Rojas, No. 11 Cr. 929 (PAE), 2024 WL 4345561, at *3 (S.D.N.Y. Sept. 30, 2024).

In short, when a court considers a motion for compassionate release filed by a defendant, the court may only grant that motion

where the defendant has demonstrated that (i) he has exhausted his administrative remedies, (ii) there are extraordinary and compelling reasons for a reduction of the sentence, (iii) the Section 3553(a) factors favor such a reduction, and (iv) such a reduction is consistent with the Sentencing Commission's policy statements.  See 18 U.S.C. § 3582(c)(1)(A)(i).  The defendant, as the proponent of the motion, bears the burden of proving that he is entitled to the requested relief under Section 3582.  See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); United States v. Ebbers, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction.") (citing Butler, 970 F.2d at 1026); United States v. Givens, No. 14 Cr. 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (similar).

Additionally, if the Court "concludes that the applicable section 3553(a) factors do not support a sentence reduction, it need not determine whether the defendant has shown extraordinary and compelling reasons."  United States v. Giattino, No. 23-6918-cr, 2024 WL 4579342, at *2 (2d Cir. Oct. 25, 2024) (summary order) (citing United States v. Keitt, 21 F.4th 67, 73 (2d Cir. 2021) (per curiam)); see also United States v. Ramirez, 571 F. Supp. 3d 40, 45 (S.D.N.Y. 2021) ("A court may still deny compassionate

release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

## III. **Discussion**

### a. **Extraordinary and Compelling Reasons**

In arguing for a sentence reduction, Defendant cites his medical conditions, his family situation, his efforts at rehabilitation, and the comparative length of his sentence. Whether considered separately or together, these do not show extraordinary and compelling reasons warranting release.

The amended Section 1B1.13 provides that a defendant's medical conditions are extraordinary and compelling where the defendant (i) is "suffering from a terminal illness"; (ii) is suffering from serious medical conditions "that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (iii) is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or (iv) the defendant is at risk for severe medical complications or death as a result of exposure to an ongoing outbreak of infectious disease or public health emergency. U.S.S.G. § 1B1.13(b)(1).

Here, Defendant does not argue that he is suffering from a terrible illness or is at a higher risk of contracting COVID-19 or other infections as a result of his conditions. He merely argues that his medical conditions are sufficiently serious to warrant release. But Defendant's conditions, whether considered separately or together, do not meet the standard set out in 1B1.13. He relies on a statement that he suffers from prediabetes, headaches, depression, anxiety, and long-term effects of COVID-19. His medical records, filed under seal, indicate that Defendant has been evaluated and treated effectively for these conditions and do not indicate any failure of medical care.

Indeed, judges in this District have regularly found that medical conditions similar to or more severe than the ones of which the Defendant complains fall short of extraordinary or compelling reasons warranting early release when being treated by the BOP. See e.g., United States v. Kornegay, No. 13 Cr. 428 (PAE), 2023 WL 2754264, at *6 (S.D.N.Y. Apr. 3, 2023) (finding no extraordinary or compelling medical conditions where defendant claimed he may have had kidney disease and an ulcer, and had bacteria in his digestive tract, pain in his lung area, and hypertension); United States v. Naut, No. 18 Cr. 219 (AT), 2021 WL 3115812, at *2 (S.D.N.Y. July 22, 2021) (finding no extraordinary or compelling reasons for release where the defendant was vaccinated for COVID-19, was receiving Lisinopril to treat hypertension, and suffered

from prediabetes, an enlarged prostate, and elevated ALT levels, which could be indicative of liver disease); United States v. Rodriguez, No. 11 Cr. 755 (JFK), 2021 WL 37689, at *3 (S.D.N.Y. Jan. 5, 2021), reconsideration denied, No. 11 Cr. 755 (JFK), 2022 WL 2801009 (S.D.N.Y. July 18, 2022) (finding that the defendant's "health issues such as his hypertension, sinus, dental, psychological, and environmental problems and high cholesterol and weight . . . are not severe enough to warrant compassionate release" (internal citation omitted)); United States v. Williams, No. 00 Cr. 237 (VM), 2020 WL 4735353, at *1 (S.D.N.Y. Aug. 14, 2020) (finding that, although the defendant's "medical records reflect that he has diabetes, high blood pressure, high cholesterol, a skin condition, and vision issues," he has not demonstrated that extraordinary or compelling reasons warrant a sentence reduction).

Defendant also argues that his wife's surgery and need for assistance with bathing, dressing, and writing should be considered in his family circumstances. While, of course, Defendant could be of assistance to his wife, he does not argue that he is the sole caregiver for her or that another family member in the Dominican Republic is not available to assist. Accordingly, Defendant's family situation does not provide an extraordinary or compelling reason for release.

14

Defendant argues that in the last thirty-five years he has matured and grown in prison. His counsel points out that he has taken many classes in prison, has earned his GED, and has become proficient in English. (Dkt. no. 292 at 32.[1]) Counsel also points out that he has taken several "pre-release" classes, has worked steadily and successfully for UNICOR, has maintained clear conduct and family ties, and has been evaluated as having a minimal risk recidivism level. (Id. at 32-33.) Counsel also points out that Defendant has become a spiritual leader and counselor and provides several letters from inmates and others attesting to Defendant's contributions as a spiritual leader and an evaluation of him as an "honorable and respectful person, with Christian values and a powerful faith." (Id. at 35.) Counsel also points out that in the last thirty-five years Defendant has been incarcerated in six prisons and sanctioned five times, none of which involved drugs, violence, cell phones, or threatening conduct. (Id. at 40-41.)

The Court notes that after refusing for decades to accept responsibility in any way for his co-defendants' acts, Defendant is now taking responsibility for those acts. And, while Defendant is to be heartily congratulated for using his time while incarcerated in such a productive manner, Defendant's longstanding

---

[1] Page cites are to ECF page numbers.

refusal to accept responsibility for the acts of his co-defendants undermines Defendant's arguments about rehabilitation.

Finally, Defendant argues that his sentence, and, indeed, his time already served, are much harsher than those of other defendants who he argues are similarly situated. (Dkt. no. 292 at 28-31.)  Those cases, however, do not include the most egregious fact of this Defendant and his co-defendants' conduct, that is, that they conspired to use deadly force against a federal agent in connection with a narcotics offense.  Thus, the Court rejects Defendant's comparisons.  The Court also notes that Defendant's co-conspirators are also serving life sentences.  Accordingly, the Court finds that none of the factors proffered by Defendant, either singly or in combinations, constitute extraordinary and compelling circumstances warranting release.

### b. Section 3553(a) Factors

Even if Defendant had established extraordinary and compelling conditions, the Section 3553(a) factors weigh against release.  Most importantly, the seriousness of Defendant's conduct requires that he serve a life sentence.  As the Court noted at sentencing, Defendant's offense conduct "came within millimeters of taking a human life." (Sent. Tr. 83.)  Defendant may not have pulled the trigger himself, but he had an understanding with his co-defendants that should anyone interfere with their drug business, then they would resort to using deadly force to protect

16

their criminal enterprise.  That is exactly what happened here.
That Defendant was not the one who pulled the trigger does not
absolve him of responsibility for the considerable harm he and his
co-defendants caused, both to Special Agent Travers and the
confidential source, both of whom were shot, but also to others in
his apartment building and his neighborhood.

    The severity of the harm caused by Romero cannot be
overstated.  On October 5, 2020, the Government filed a letter in
opposition to a motion for a reduction in sentence filed by one of
Defendant's co-defendants.  (Dkt. no. 301 at 9.)  In that letter,
the Government provided an update on Special Agent Travers
condition.  The Government stated as follows:

> When the defendant stood trial, Special Agent Travers
> described his injuries and the treatment he had received
> then to date.  Over the intervening years, Travers's
> need for medical attention has only gradually abated.
> Travers's injuries resulted in over a year and a half
> convalescence and fourteen surgeries over the course of
> three years.  Even after these surgeries, which
> including painful bone grafts and the permanent
> insertion of numerous metal plates, screws, bolts, and
> other joints, Travers still requires prosthetic devices
> to maintain the shape of his face.  He inserts these
> prostheses each morning and removes them before sleep
> every night.  Alongside at a minimum annual check-ins
> with his medical team, Travers suffers from chronic
> sinus infections which are of themselves inordinately
> dangerous.  Because his sinuses were effectively
> destroyed during the shooting, and now cannot properly
> drain, Travers experiences frequent infections which are
> difficult to treat and pose outsized threats to his
> health.  These same conditions make it impossible for
> Travers to breathe at night unless he sleeps in one
> specific position on his side; any other position will
> cause him to stop breathing.  The right side of Travers's

17

> face is numb to the touch, and his face and neck bear
> deep scars from the shooting, his emergency tracheotomy,
> and the various reconstructive surgeries that were
> required to repair the damage caused by the shooting.
> In sum, to this day Travers bears the scars and suffers
> daily the consequences of his brush with the defendant.
> Travers did, of course, survive this confrontation, and
> later retired from the DEA after decades of continued,
> albeit limited, service.    Special Agent Travers's
> recovery does not diminish the extraordinary hardships
> he faced as a result of the defendant's conduct and with
> which he struggles to this day.   This is another of the
> factors that made a life sentence appropriate when first
> imposed, and which continues to make it appropriate
> today.

(Id.)  Accordingly, the seriousness of Defendant's conduct and the long-term consequences of his actions from which Special Agent Travers still suffers today all weigh against granting Defendant's motion for early release.

Second, maintaining Defendant's sentence promotes respect for both the law and for law enforcement.   Indeed, as Judge Ward explained at sentencing, "[E]very federal agent and law enforcement office in this city and in this country has the right to expect that the courts will help protect them as they go about their tasks and exact punishment on those people who have been convicted of such crimes."  (Sent. Tr. at 68.)

Third, with respect to general deterrence, a life sentence is necessary to deter others from engaging in narcotics trafficking and using firearms, particularly when directed at a federal agent. With respect to specific deterrence, although this was Defendant's first known offense, his refusal to accept responsibility for his

co-defendants' conduct for decades require this much deserved sentence.

Fourth, while Defendant's rehabilitation has been commendable and is the strongest factor he presents, it is not strong enough to carry the entire weight of extraordinary and compelling circumstances. Indeed, it is very close to the sole event and thus is indisputably insufficient.

Finally, releasing Defendant would result in an unwarranted sentencing disparity because his co-defendants continue to serve their well-deserved life sentences. Accordingly, the Section 3553(a) factors counsel against release.

## IV. <u>Conclusion</u>

For the reasons set out above, Defendant's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), (dkt. no. 239), is DENIED.

As the motion makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. <u>See</u> 28 U.S.C. § 2253. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. <u>Cf.</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

The Clerk of the Court is directed to close dkt. no. 239 and mail a copy of this order to Defendant.

**SO ORDERED.**

Dated:      New York, New York
            April 17, 2025

_____
LORETTA A. PRESKA
Senior United States District Judge